**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| SHIVA STEIN,<br><br>Plaintiff,<br><br>v.<br><br>MAGELLAN HEALTH, INC., STEVEN J. SHULMAN, SWATI ABBOTT, CHRISTOPHER J. CHEN, KEN FASOLA, PETER A. FELD, MURAL R. JOSEPHSON, SCOTT MACKENZIE, LESLIE V. NORWALK, and GUY P. SANSONE.,<br><br>Defendants. | Civil Action No. ______________<br><br>**COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Shiva Stein ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

1. This is an action brought by Plaintiff against Magellan Health, Inc. ("Magellan" or the "Company") and the members of Magellan's board of directors (the "Board" or the "Individual Defendants" and collectively with the Company, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), in connection with the proposed acquisition of Magellan by Centene Corporation ("Centene") and Centene's affiliates.

2. Defendants have violated the above-referenced sections of the Exchange Act by causing a materially incomplete and misleading Preliminary Proxy Statement on Schedule 14A (the "Proxy Statement") to be filed on February 8, 2021 with the United States Securities and

Exchange Commission ("SEC") and disseminated to the Company's stockholders. The Proxy Statement recommends that the Company's stockholders vote in favor of a proposed transaction whereby Mayflower Merger Sub, Inc. ("Merger Sub") will merge with and into Magellan, with Magellan surviving the merger and becoming a wholly-owned subsidiary of Centene (the "Proposed Transaction"). Pursuant to the terms of the definitive agreement and plan of merger the companies entered into (the "Merger Agreement"), each Magellan common share issued and outstanding will be converted into the right to receive $95.00 in cash (the "Merger Consideration").

3. As discussed below, Defendants have asked Magellan's stockholders to support the Proposed Transaction based upon the materially incomplete and misleading representations and information contained in the Proxy Statement, in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy Statement contains materially incomplete and misleading information concerning the Company's financial forecasts and financial analyses conducted by the financial advisors of the Company, Goldman Sachs & Co. LLC ("Goldman Sachs") and Guggenheim Securities, LLC ("Guggenheim"), in support of their fairness opinions, and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

4. It is imperative that the material information that has been omitted from the Proxy Statement is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

5. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Magellan's stockholders or, in the event the

Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Magellan in incorporated in this District.

## PARTIES

9. Plaintiff is, and has been at all relevant times, the owner of Magellan common stock and has held such stock since prior to the wrongs complained of herein.

10. Individual Defendant Steven J. Shulman has served as a member of the Board since 2019 and is the Chairman of the Board.

11. Individual Defendant Swati Abbott has served as a member of the Board since 2018.

12. Individual Defendant Christopher J. Chen has served as a member of the Board since 2020.

13. Individual Defendant Ken Fasola has served as a member of the Board since 2019 and is the Company's Chief Executive Officer.

14. Individual Defendant Peter A. Feld has served as a member of the Board since 2019.

15. Individual Defendant Mural R. Josephson has served as a member of the Board since 2020.

16. Individual Defendant Scott MacKenzie has served as a member of the Board since 2016.

17. Individual Defendant Leslie V. Norwalk has served as a member of the Board since 2019.

18. Individual Defendant Guy P. Sansone has served as a member of the Board since 2019.

19. Defendant Magellan is incorporated in Delaware and maintains its principal offices at 4801 E. Washington Street, Phoenix, Arizona 85034. The Company's common stock trades on the NASDAQ Stock Exchange under the symbol "MGLN."

20. The defendants identified in paragraphs 10-18 are collectively referred to as the "Individual Defendants" or the "Board."

21. The defendants identified in paragraphs 10-19 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. <u>The Proposed Transaction</u>

22. Magellan, together with its subsidiaries, provides healthcare management services in the United States. The Company operates in Healthcare and Pharmacy Management segments. The Healthcare segment offers carve-out management services for behavioral health; employee assistance plans (EAP); and other areas of specialty healthcare, including diagnostic imaging, musculoskeletal management, cardiac, and physical medicine. It also contracts with state

Medicaid agencies, and the centers for Medicare and Medicaid services to manage care for beneficiaries under Medicaid and Medicare programs, such as healthcare and long-term support services through its network of medical and behavioral health professionals, clinics, hospitals, nursing facilities, home care agencies, and ancillary service providers. The Pharmacy Management segment comprises products and solutions that provide clinical and financial management of pharmaceuticals paid under medical and pharmacy benefit programs. Further, it offers pharmacy benefit management services, such as pharmaceutical dispensing services; pharmacy benefit administration for state Medicaid and other government sponsored programs; clinical and formulary management programs; medical pharmacy management programs; and programs for the integrated management of specialty drugs that treat complex conditions. In addition, the company provides services to health plans and other managed care organizations, employers, labor unions, various military and governmental agencies, and third party administrators. Magellan was incorporated in 1969 and is headquartered in Phoenix, Arizona.

23. On January 4, 2021, Magellan and Centene jointly announced that they had entered into a proposed transaction:

> ST. LOUIS and PHOENIX, Jan. 4, 2021 /PRNewswire/ -- Centene Corporation (NYSE: CNC) and Magellan Health, Inc. (NASDAQ: MGLN) today announced that they have entered into a definitive merger agreement under which Centene will acquire Magellan Health for $95 per share in cash for a total enterprise value of $2.2 billion. The transaction, which was unanimously approved by the Boards of Directors of both companies, will broaden and deepen Centene's whole health capabilities and establish a leading behavioral health platform. The combined platform lays the foundation by which the company will continue to invest and innovate for its members, enabling improved health outcomes and faster, diversified growth.
>
> The combination brings together the companies' complementary capabilities in behavioral health, specialty healthcare and pharmacy management. As a result of the transaction, Centene will establish one of the nation's largest behavioral health platforms across 41 million unique members with enhanced capabilities to deliver better health outcomes for complex, high-cost populations. Magellan Health will also add to Centene's leadership in government sponsored healthcare, bringing 5.5

million new members on government-sponsored plans. Magellan Health also provides specialty health services for 18 million third-party customer members in addition to Centene's own members. Furthermore, the transaction adds 2 million PBM members and 16 million medical pharmacy members, enhancing the scale of Centene's pharmacy platform with leading capabilities in specialty drug management. As part of Centene's Health Care Enterprises, Magellan Health will continue to independently support its existing customers and pursue growth opportunities. In addition, the transaction will create attractive shareholder returns through enhanced service capabilities, cross-sell opportunities and increased engagement with third-party customers.

"There is a critical need for a fundamentally better approach to supporting people with complex, chronic conditions through better integration of physical and mental health care. This has become even more evident in light of the pandemic which has driven a dramatic rise in behavioral health needs," said Michael F. Neidorff, Chairman, President and Chief Executive Officer of Centene. "This acquisition accelerates our diversification strategy and enhances our ability to build next generation capabilities in our specialty care business by leveraging our scale and investments in technology. Furthermore, we are very familiar with the range of Magellan Health's healthcare solutions as we have been one of their customers over many years, and our shared commitment to taking care of the most vulnerable populations makes this transaction a natural step."

"We're thrilled to bring together two businesses with complementary capabilities and a shared commitment to driving higher quality care for our members while lowering overall healthcare costs," said Kenneth J. Fasola, Chief Executive Officer of Magellan Health. "By joining Centene under the Health Care Enterprises umbrella, we will maintain the independence necessary to ensure continued service to our third-party customers while accelerating the introduction of innovative solutions and reimagining behavioral health. I look forward to continuing to lead Magellan Health as we create exciting new opportunities for our customers and employees who will benefit from the creation of a best-in-class platform that meets our members' needs today and in the future."

**Strategic and Financial Benefits of the Transaction:**

- **Broadening and deepening Centene's whole health capabilities at a critical time**: the acquisition increases Centene's scale and capability in behavioral care at a time when more than 2 in 5 Americans are struggling with mental or behavioral health issues associated with the COVID-19 pandemic.[1] In addition, the sickest 5% of the population consume 50% of healthcare spending and Magellan Health's behavioral health, specialty health and pharmacy offerings focus on the portion of this spend that is addressable.[2]

- **Advancing Centene's specialty care and Health Care Enterprises platforms**: the transaction brings additional scale in the company's growing specialty care division and complements Centene's evolving Health Care Enterprises portfolio,

aligned with delivering the latest technologies and services across the full spectrum of its members.

- **Enabling better health outcomes at lower total medical costs**: by combining both companies' capabilities in behavioral health and specialty healthcare, the acquisition enables more integrated solutions across physical and mental health to deliver better health outcomes at lower costs for complex, high-cost populations.

- **Value creation for shareholders**: the acquisition will create attractive opportunities to grow Centene's specialty care business with enhanced services, new product development and additional third party relationships. Centene expects the transaction to be slightly accretive in the first full year and deliver low to mid-single digit percent adjusted EPS accretion from the transaction by the second full year, including approximately $50 million in annual net cost synergies projected by the second full year. The net synergies are in addition to the cost reduction plan of $75 million already initiated by Magellan Health.

**Organization and Leadership**

Ken Fasola, CEO of Magellan Health, and other members of Magellan Health's leadership team have agreed to join Centene to provide continuity to Magellan Health's strategy and leadership.

**Timing and Required Approvals**

The transaction is subject to clearance under the Hart-Scott Rodino Act, receipt of required state regulatory approvals, the approval of the definitive merger agreement by Magellan Health's stockholders and other customary closing conditions. In connection with the transaction, affiliates of Starboard Value LP, which own approximately 9.4% of Magellan Health's outstanding shares of common stock in the aggregate, have entered into a merger support agreement whereby they have agreed to vote their shares in favor of the transaction at Magellan Health's special meeting.

The transaction is not contingent upon financing. Centene intends to primarily fund the cash portion of the acquisition through debt financing, and J.P. Morgan has provided a $2.381 billion bridge financing commitment. Upon closing, Centene expects its debt-to-capital ratio to be in the low 40% range, and intends to use its strong earnings and cash flows to achieve its targeted debt-to-capital ratio in the upper 30% range within 12 to 18 months post close.

Centene and Magellan Health expect to complete the transaction in the second half of 2021.

> **Advisors**
>
> Allen & Company LLC, J.P. Morgan Securities LLC and Barclays are serving as financial advisors to Centene, and Skadden, Arps, Slate, Meagher & Flom LLP is serving as its legal counsel. Goldman Sachs & Co. LLC and Guggenheim Securities, LLC are serving as financial advisors to Magellan Health, and Weil, Gotshal & Manges LLP is serving as its legal counsel.

24. The Board has unanimously approved the Proposed Transaction. It is therefore imperative that Magellan's stockholders are provided with the material information that has been omitted from the Proxy Statement, so that they can meaningfully assess whether or not the Proposed Transaction is in their best interests prior to the forthcoming stockholder vote.

## B. The Materially Incomplete and Misleading Proxy Statement

25. On February 8, 2021, Magellan filed the Proxy Statement with the SEC in connection with the Proposed Transaction. The Proxy Statement was furnished to the Company's stockholders and solicits the stockholders to vote in favor of the Proposed Transaction. The Individual Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Omissions and/or Material Misrepresentations Concerning Magellan Financial Projections*

26. The Proxy Statement fails to provide material information concerning financial projections by Magellan management and relied upon by Goldman Sachs and Guggenheim in their analyses. The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading. The Proxy Statement indicates that in connection with the rendering of its fairness opinion, the Company prepared certain non-public financial forecasts

(the "Company Projections") and provided them to the Board and the financial advisors with forming a view about the stand-alone valuation of the Company. Accordingly, the Proxy Statement should have, but fails to provide, certain information in the projections that Magellan management provided to the Board and the financial advisors. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

27. The Proxy Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics: Segment Profit, EBITDA, Adjusted EPS, and Unlevered Free Cash Flow, but fails to provide line items used to calculate these metrics and/or a reconciliation of these non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

28. When a company discloses non-GAAP financial measures in a proxy statement that were relied on by a board of directors to recommend that stockholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

29. The SEC has noted that:

> companies should be aware that this measure does not have a uniform definition and its title does not describe how it is calculated.

> Accordingly, a clear description of how this measure is calculated, as well as the necessary reconciliation, should accompany the measure where it is used. Companies should also avoid inappropriate or potentially misleading inferences about its usefulness. For example, "free cash flow" should not be used in a manner that inappropriately implies that the measure represents the residual cash flow available for discretionary expenditures, since many companies have mandatory debt service requirements or other non-discretionary expenditures that are not deducted from the measure.[1]

30. Thus, to cure the Proxy Statement and the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information in the Proxy Statement, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures to make the non-GAAP metrics included in the Proxy Statement not misleading.

31. With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis* for the Company, the Proxy Statement fails to disclose: (i) the terminal values calculated for the Company; (ii) the inputs and assumptions underlying the range of discount rates ranging from 7.0% to 8.0%, (iii) the inputs and assumptions underlying the use of terminal year EBITDA exit multiples ranging from 6.5x to 8x; (iv) the inputs and assumptions underlying the use of the range of perpetuity growth rates from negative 0.6% to 1.7%; (v) Company-specific inputs used to derive the discount rates, including the Company's target capital structure weightings, the cost of long-term debt, future applicable marginal cash tax rate and a beta for the Company; (vi) the historical NTM enterprise value/EBITDA multiples for the Company over the past five years; (vii) net proceeds from the MCC Business Sale and collections in November 2020 stemming from the Company's wind down of its Medicare Part D prescription drug plan and the impact of the investments made by the Company in December 2020; (viii) the Company's net debt as of

---

[1] U.S. Securities and Exchange Commission, Non-GAAP Financial Measures, last updated April 4, 2018, available at: https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

September 30, 2020; (ix) the Company's unrestricted cash and short term investments balance as of September 30, 2020; and (x) the number of the fully diluted shares of Magellan common stock as of December 28, 2020.

32. With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis* for the Company, the Proxy Statement fails to disclose: (i) the inputs and assumptions underlying the use of the range of illustrative NTM P/E multiples from 16.0x to 24.0x; and (ii) the inputs and assumptions underlying the discount rate of 8.5%.

33. With respect to Goldman Sachs' *Premia Paid Analysis*, the Proxy Statement fails to disclose: the premia and the transactions observed by Goldman Sachs.

34. With respect to Goldman Sachs' *Selected Precedent Transactions Analysis* for the Company, the Proxy Statement fails to disclose (i) the transaction value of each transaction observed by Goldman Sachs; and (ii) the dates of the closings of each transaction observed by Goldman Sachs.

35. With respect to Guggenheim's *Discounted Cash Flow Analysis* for the Company, the Proxy Statement fails to disclose: (i) the terminal values calculated for the Company; (ii) the inputs and assumptions underlying the range of discount rates ranging from 7.5% to 8.5%, (iii) the inputs and assumptions underlying the use of the range of perpetuity growth rates from 1.0% to 2.0%; and (iv) Company-specific inputs used to derive the discount rates, including the Company's forward-looking equity beta reference range, the Company's assumed forward-looking capital structure and the corresponding blended cost of debt, the Company's prospective marginal cash income tax rate, and the appropriate size/liquidity premium for the Company.

36. With respect to Guggenheim's *Selected Precedent Merger and Acquisition Transactions Analysis* for the Company, the Proxy Statement fails to disclose (i) the transaction

value of each transaction observed by Guggenheim; (ii) the dates of the closings of each transaction observed by Guggenheim; and (iii) the inputs and assumptions to derive the transaction enterprise value/NTM EBITDA multiple of 9.0x – 11.0x.

37. With respect to Guggenheim's *Selected Publicly Traded Companies Analysis*, the Proxy Statement fails to disclose the inputs and assumptions to derive the reference range of trading price/adjusted earnings per share multiple of 13.0x – 18.0x.

38. With respect to Guggenheim's *Wall Street Equity Research Analyst Stock Price Targets* analysis, the Proxy Statement fails to disclose the Wall Street equity research analyst noted by Guggenheim and the selected stock price targets for the Company.

39. In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special stockholder meeting to vote on the Proposed Transaction, Plaintiff will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### On Behalf of Plaintiff Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100

40. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

41. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

42. Defendants have issued the Proxy Statement with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement and the use of their name in the Proxy Statement, which fails to provide critical information regarding, among other things, financial analyses that were prepared by Goldman Sachs and Guggenheim and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

43. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

44. Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation and review of strategic alternatives and the Company's financial projections.

45. The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

46. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

47. The Individual Defendants acted as controlling persons of Magellan within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of Magellan, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Magellan, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

48. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

49. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Magellan, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations

alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy Statement at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction. The Individual Defendants were thus directly involved in the making of the Proxy Statement.

50. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

51. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

52. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

53. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands injunctive relief in her favor and against the Defendants jointly and severally, as follows:

A. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with,

consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy Statement;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C. Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: February 10, 2021

**RIGRODSKY LAW, P.A.**

By: */s/ Gina M. Serra*
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: gms@rl-legal.com
Email: hwm@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Gloria Kui Melwani
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
Email: melwani@whafh.com